**UNITED STATES DISTRICT COURT**
**WESTERN DISTRICT OF MICHIGAN**
**SOUTHERN DIVISION**

| | |
|---|---|
| CAROL ELLISON, Individually and for Others Similarly Situated | **Case No. 1:26-cv-01973** |
| v. | Jury Trial Demanded |
| PINE REST CHRISTIAN MENTAL HEALTH SERVICES | FLSA Collective Action |

**COLLECTIVE ACTION COMPLAINT**

**SUMMARY**

1.      Carol Ellison (Ellison) brings this collective action to recover unpaid wages and other damages from Pine Rest Christian Mental Health Services (Pine Rest).

2.      Pine Rest employed Ellison as one of its Hourly Employees (defined below) in Michigan.

3.      Ellison and the other Hourly Employees regularly work more than 40 hours in a workweek.

4.      But Pine Rest does not pay them for all hours worked.

5.      Additionally, Pine Rest automatically deducts 30 minutes a day from these employees' hours for so called "meal periods" (Rine Rest's "auto-deduction policy").

6.      Ellison and the other Hourly Employees are not paid for this time.

7.      But Ellison and the other Hourly Employees do not actually receive *bona fide* meal breaks.

8.      Pine Rest requires Ellison and the other Hourly Employees to remain on duty and perform compensable work throughout their shifts, including during "meal periods," and subjects them to work interruptions during their "meal breaks."

9.    Additionally, Pine Rest requires Ellison and the other Hourly Employees to clock in and out for their shifts via its timekeeping system (Pine Rest's "rounding policy").

10.    But Pine Rest automatically rounds these employees' clock in and clock out punches to the nearest quarter hour for its own primary benefit.

11.    Pine Rest also requires Ellison and the other Hourly Employes to attend virtual meetings and complete required training "off the clock" and without compensation (Pine Rest's "training policy").

12.    Finally, Pine Rest does not pay Ellison and the other Hourly Employees at least 1.5 times their regular rates of pay—based on all remuneration—for hours worked in excess of 40 in a workweek.

13.    Instead, Pine Rest pays Ellison and the other Hourly Employees non-discretionary bonuses, including sign-on bonuses, that it excludes from these employees' regular rates of pay for overtime purposes (Pine Rest's "bonus pay scheme").

14.    Pine Rest's auto-deduction policy, rounding policy, training policy, and bonus pay scheme violate the Fair Labor Standards Act (FLSA) by failing to compensate Ellison and the other Hourly Employees at least 1.5 times their regular rates of pay—based on all remuneration—for hours worked in excess of 40 in a workweek.

## JURISDICTION & VENUE

15.    This Court has original subject matter jurisdiction pursuant to 28 U.S.C. § 1331 because this case involves a federal question under the FLSA. 29 U.S.C. § 216(b).

16.    This Court has general personal jurisdiction over Pine Rest because it is a Michigan corporation.

17.    Venue is proper because Pine Rest maintains its principal place of business in Kent County, Grand Rapids, Michigan, which is in this District and Division. 28 U.S.C. § 1391(b)(1).

**PARTIES**

18.    Pine Rest employed Ellison as a registered nurse (RN) from approximately May 2023 to August 2025.

19.    Throughout her employment, Pine Rest subjected Ellison to its auto-deduction policy, rounding policy, training policy, and bonus pay scheme.

20.    Ellison's written consent is attached as **Exhibit 1**.

21.    Ellison brings this collective action on behalf of herself and similarly situated Pine Rest employees.

22.    The putative FLSA collective of similarly situated employees is defined as:

> **All hourly employees who Pine Rest paid under its auto-deduction policy, rounding policy, training policy, and/or bonus pay scheme, during the last three years through final resolution of this action (the "Hourly Employees").**

23.    Pine Rest is a Michigan corporation with its principal place of business in Kent County, Grand Rapids, Michigan.

24.    Pine Rest may be served with process through its registered agent: **Robert L Nykamp, 300 68th St. SE, Grand Rapids, Michigan 49548, or wherever he may be found**.

**FLSA COVERAGE**

25.    At all relevant times, Pine Rest was an "employer" within the meaning of the FLSA. 29 U.S.C. § 203(d).

26.    At all relevant times, Pine Rest was an "enterprise" within the meaning of the FLSA. 29 U.S.C. § 203(r).

27.    At all relevant times, Pine Rest was an "enterprise engaged in commerce or in the production of goods for commerce" within the meaning of the FLSA because it had employees engaged in commerce or in the production of goods for commerce, or employees handling, selling, or

otherwise working on goods or materials—such as cell phones, computers, and personal protective equipment—that have been moved in or produced for commerce. 29 U.S.C. § 203(s)(1).

28.     At all relevant times, Pine Rest had an annual gross volume of sales made or business done of not less than $1,000,000 each year.

29.     At all relevant times, Ellison and the other Hourly Employees were Pine Rest's "employees" within the meaning of the FLSA. 29 U.S.C. § 203(e).

30.     At all relevant times, Ellison and the other Hourly Employees were engaged in commerce or in the production of goods for commerce.

**FACTS**

31.     Pine Rest states it is "the second-largest non-profit mental health care provider in the country … offering the full continuum of care from [its] 220-acre main campus, which includes a state-of-the-art psychiatric urgent care center and a soon-to-be-built pediatric behavioral health center, plus outpatient locations and telehealth services throughout Michigan."[1]

32.     To meet its business objectives, Pine Rest employs workers, including Ellison and the other Hourly Employees, to provide healthcare services to its patients.

33.     Pine Rest advertises open positions across its facilities and solicits applications for these positions through its website.[2]

34.     For example, Pine Rest employed Ellison as an RN in Grand Rapids from approximately May 2023 to August 2025.

---

[1] https://www.pinerest.org/pinerest-careers/why-pine-rest/ (last visited June 22, 2026).
[2] https://www.pinerest.org/pinerest-careers/ (last visited June 22, 2026).

35.     Ellison's primary job duties included providing medical care according to patients' care plan, including administering medication, in collaboration with interdisciplinary teams and physicians and to document and report behavioral or health-affecting incidents.

36.     Throughout her employment, Ellison regularly worked more than 40 hours in a workweek.

37.     Ellison typically worked 8 or 16-hour shifts, 5 to 7 days a week "on the clock" (generally 48 to 64 hours in a workweek).

38.     Pine Rest paid Ellison approximately $45 an hour.

39.     Likewise, the other Hourly Employees typically work approximately 48 to 64hours in a workweek "on the clock."

40.     Ellison and the Hourly Employees perform their jobs under Pine Rest's supervision and use materials, equipment, and technology Pine Rest approves and supplies.

41.     Pine Rest requires Ellison and its other Hourly Employees, across its facilities, to abide by common work, time, pay, meal break, and overtime policies and procedures in the performance of their jobs.

42.     At the end of each pay period, Ellison and the other Hourly Employees receive wages from Pine Rest that are determined by common systems and methods that Pine Rest selects and controls.

43.     Pine Rest requires Ellison and the other Hourly Employees to report their "on the clock" hours worked through Pine Rest's designated timekeeping system.

44.     But Pine Rest does not pay Ellison and the other Hourly Employees at the required premium overtime rates for all hours worked in excess of 40 in a workweek.

45.     Instead, Pine Rest subjects Ellison and the other Hourly Employees to its auto-deduction policy.

46.    Specifically, Pine Rest automatically deducts 30-minutes a workday from Ellison's and the other Hourly Employees' recorded hours and wages for so called "meal periods."

47.    Pine Rest automatically deducts this time regardless of whether Ellison and the Hourly Employees actually receive full, uninterrupted, 30-minute meal periods.

48.    Pine Rest simply assumes Ellison and the Hourly Employees receive *bona fide* meal periods each shift they work.

49.    But Ellison and the Hourly Employees do not actually receive *bona fide* meal periods.

50.    Instead, Pine Rest requires Ellison and the Hourly Employees to remain on duty and perform compensable work throughout their shifts for Pine Rest's predominant benefit, including during so called "meal periods."

51.    And Pine Rest subjects Ellison and the Hourly Employees to work interruptions during unpaid, attempted "meal periods."

52.    Thus, Ellison and the other Hourly Employees are not free to engage in personal activities during unpaid "meal periods."

53.    Rather, largely due to understaffing, Ellison and the other Hourly Employees are forced to substantially perform their regular job duties and responsibilities during their unpaid "meal periods."

54.    Thus, Ellison and the other Hourly Employees routinely spend their unpaid "meal periods" performing work for Pine Rest's—not their own —predominant benefit.

55.    This unpaid time is compensable under the FLSA because Pine Rest knew, or should have known, that (1) Ellison and the Hourly Employees were performing unpaid work during their "meal periods," (2) they were interrupted with work duties, such as monitoring and assisting patients' urgent needs during attempted "meal period," (3) they were not completely relieved of all duties during their "meal periods," (4) they entirely skipped "meal periods" due to work demands stemming from

a lack of patient coverage often due to understaffing, (5) "meal periods" were less than 20 consecutive minutes, (6) they were not free to engage in personal activities during their "meal periods" because of work interruptions, (7) they remained on Pine Rest's premises and under Pine Rest's supervision, and/or (8) they spent unpaid "meal periods" substantially performing their regular patient care duties for Pine Rest's predominant benefit.

56.    Pine Rest fails to exercise its duty as Ellison's and the Hourly Employees' employer to ensure these employees are not performing work that Pine Rest does not want performed during their unpaid "meal periods."

57.    Additionally, Pine Rest subjects Ellison and the other Hourly Employees to its rounding policy.

58.    Specifically, Pine Rest automatically rounds Ellison's and the other Hourly Employees' recorded clock in and clock out punches to the nearest quarter hour for its own primary benefit and to the detriment of these employees.

59.    Pine Rest prohibits Ellison and its other Hourly Employees from clocking in for their shifts more than 7.5 minutes before their start times and clocking out more than 7.5 minutes after their end times.

60.    Pine Rest takes disciplinary action or threatens to do so if Ellison or other Hourly Employees clock in past their scheduled start time or clock out before their scheduled end time.

61.    Likewise, Pine Rest takes disciplinary action or threatens to do so if they clock in too long before their scheduled start time or clock out too long after their scheduled end time.

62.    Pine Rest further requires and expects Ellison and its other Hourly Employees to perform their normal job duties immediately upon clocking in.

63.    By enforcing these policies, Pine Rest ensures its rounding policy benefits Pine Rest to the detriment of Ellison and its other Hourly Employees.

64. Under its training policy, Pine Rest further requires Ellison and the other Hourly Employees to complete mandatory virtual trainings and attend mandatory virtual meetings, including on their "days off," off the clock and without compensation.

65. Pine Rest knows Ellison and the other Hourly Employees routinely perform work "off the clock" during their unpaid "meal periods" and before and after their shifts because Pine Rest expects and requires them to do so.

66. Pine Rest required, requested, suffered, or permitted Ellison and the Hourly Employees to work "off the clock" during their unpaid "meal periods" and/or before and after their shifts.

67. Despite accepting the benefits, Pine Rest does not pay Ellison and the other Hourly Employees for the compensable work they perform during their automatically deducted "meal periods" and before and after their shifts.

68. Thus, under Pine Rest's auto-deduction policy, rounding policy, and training policy, Ellison and the Hourly Employees are denied overtime wages during workweeks in which they work more than forty hours, in violation of the FLSA.

69. Finally, throughout their employment, Pine Rest has not paid Ellison and the other Hourly Employees at the required premium rates for all hours worked in excess of 40 in a workweek.

70. Instead, Pine Rest pays Ellison and the other Hourly Employees under its bonus pay scheme.

71. Specifically, Pine Rest agrees to pay and subsequently pays Ellison and the other Hourly Employees non-discretionary bonuses, including sign on bonuses and shift bonuses, if these employees fulfill criteria Pine Rest sets.

72. But Pine Rest excludes these non-discretionary bonuses from their regular rates of pay for overtime purposes.

- 8 -

73. For example, Pine Rest paid Ellison a sign on bonus of approximately $8,000 if she remained employed for the requisite timeframe.

74. And Pine Rest paid Ellison shift bonuses of approximately $250 to $450 when she worked high demand shifts designated by Pine Rest.

75. But Pine Rest excluded these non-discretionary bonuses from Ellison's regular rate of pay for overtime purposes during workweeks she earned the bonuses and worked more than 40 hours.

76. Thus, under its bonus pay scheme, Pine Rest does not pay Ellison and the other Hourly Employees overtime wages of at least 1.5 times their regular rates of pay—based on all remuneration—for hours in excess of 40 a workweek, in violation of the FLSA.

## COLLECTIVE ACTION ALLEGATIONS

77. Ellison brings her claims as a collective action under Section 216(b) of the FLSA on behalf of herself and the other Hourly Employees.

78. Like Ellison, the other Hourly Employees are victimized by Pine Rest's auto-deduction policy, rounding policy, training policy and/or bonus pay scheme.

79. Other Hourly Employees worked with Ellison and indicated they were paid in the same or similar manner under Pine Rest's auto-deduction policy, rounding policy, training policy and/or bonus pay scheme.

80. Based on her experience with Pine Rest, Ellison is aware Pine Rest's auto-deduction policy, rounding policy, training policy and bonus pay scheme were imposed on other Hourly Employees.

81. The Hourly Employees are similarly situated in the most relevant respects.

82. Even if their job duties and locations might vary, these differences do not matter for the purpose of determining their entitlement to overtime wages at the required premium rate—based on all remuneration—for all overtime hours worked.

83. Therefore, the specific job titles or locations of the Hourly Employees do not prevent collective treatment.

84. Rather, Pine Rest's auto-deduction policy, rounding policy, training policy and bonus pay scheme render Ellison and the other Hourly Employees similarly situated for the purpose of determining their right to overtime wages at the required rate—based on all remuneration—for all hours worked in excess of 40 in a workweek.

85. Pine Rest's records reflect the number of hours the Hourly Employees recorded working "on the clock" each week.

86. Pine Rest's records also show that it automatically deducted 30 minutes a day from the Hourly Employees' recorded hours for "meal periods."

87. Likewise, Pine Rest's records show the specific time the Hourly Employees punched in and out for their shifts.

88. And Pine Rest's records show that it automatically rounded the Hourly Employees' recorded time punches to the nearest quarter hour for its primary benefit and to these employees' detriment.

89. Further, Pine Rest's records show it paid Ellison and the other Hourly Employees non-discretionary bonuses it failed to include in their regular rates of pay for overtime purposes.

90. The back wages owed to Ellison and the other Hourly Employees can therefore be calculated using the same formula applied to the same records.

91. Even if the issue of damages were somewhat individual in character, the damages can be calculated by reference to Pine Rest's records, and there is no detraction from the common nucleus of liability facts.

92. Therefore, the issue of damages does not preclude collective treatment.

93. Ellison's experiences are typical of the experiences of the other Hourly Employees.

94. Ellison has no interest contrary to, or in conflict with, the other Hourly Employees that would prevent collective treatment.

95. Ellison has an interest in obtaining the unpaid wages owed to the Hourly Employees under federal law.

96. Ellison and her counsel will fairly and adequately protect the interests of the Hourly Employees.

97. Ellison retained counsel with significant experience handling complex collective action litigation.

98. Absent this collective action, many Hourly Employees will not obtain redress for their injuries, and Pine Rest will reap the unjust benefits of violating the FLSA.

99. Further, even if some of the Hourly Employees could afford individual litigation, it would be unduly burdensome to the judicial system.

100. Indeed, the multiplicity of actions would create hardship to the Hourly Employees, the Court, and Pine Rest.

101. Conversely, concentrating the litigation in one forum will promote judicial economy and consistency, as well as parity among the Hourly Employees' claims.

102. The questions of law and fact that are common to each Hourly Employee predominate over any questions affecting solely the individual members.

103. Among the common questions of law and fact are:

    a. Whether Pine Rest failed to compensate the Hourly Employees for compensable training performed "off the clock";

    b. Whether Pine Rest engaged in a policy and practice of automatic 30-minute deductions for "meal periods" that were not *bona fide*, continuous, and uninterrupted;

c.      Whether Pine Rest's auto-deduction policy deprived Ellison and the other Hourly Employees of wages for time worked during meal periods that were not *bona fide*, continuous, and uninterrupted in violation of the FLSA;

d.      Whether Pine Rest knew, or had reason to know, Ellison and the Hourly Employees were requested, suffered, permitted, or allowed to work "off the clock" during their unpaid "meal periods";

e.      Whether Pine Rest's rounding policy deprived Ellison and the Hourly Employees of wages for time worked;

f.      Whether Pine Rest paid the Hourly Employees non-discretionary bonuses;

g.      Whether Pine Rest failed to include non-discretionary bonuses in calculating the Hourly Employees' regular rates of pay;

h.      Whether Pine Rest failed to pay the Hourly Employees overtime wages at the required premium rate—based on all remuneration—for all overtime hours worked;

i.      Whether Pine Rest's decision not to pay the Hourly Employees overtime wages at the required rate—based on all remuneration—for all overtime hours worked was made in good faith; and

j.      Whether Pine Rest's violations were willful.

104.    There are many similarly situated Hourly Employees who have been denied overtime wages of at least 1.5 times their regular rates of pay—based on all remuneration—in violation of the

- 12 -

FLSA who would benefit from the issuance of a court-supervised notice of this lawsuit and the opportunity to join it.

105.    The Hourly Employees are known to Pine Rest, are readily identifiable, and can be located through Pine Rest's business and personnel records.

### PINE REST'S VIOLATIONS WERE WILLFUL

106.    Pine Rest knew it employed Ellison and the other Hourly Employees.

107.    Pine Rest knew it was subject to the FLSA's overtime provisions.

108.    Pine Rest knew the FLSA required it to pay non-exempt employees, including Ellison and the other Hourly Employees, overtime wages at rates of at least 1.5 times their regular rates of pay—based on all remuneration—for all hours worked in excess of 40 in a workweek.

109.    Pine Rest knew Ellison and each Hourly Employee worked more than 40 hours in at least one workweek during the last 3 years because these employees were required to report their "on the clock" hours via Pine Rest's timekeeping system.

110.    Pine Rest knew Ellison and the other Hourly Employees were non-exempt employees entitled to overtime pay.

111.    Pine Rest knew that, as the Hourly Employees' employer, it had a duty to ensure these employees were not performing work "off the clock" (without pay) that Pine Rest did not want performed.

112.    Pine Rest knew it failed to provide the Hourly Employees with *bona fide,* uninterrupted meal periods.

113.    Pine Rest knew the Hourly Employees did not actually receive *bona fide,* uninterrupted meal periods.

114.    Pine Rest knew the Hourly Employees regularly worked during their unpaid "meal periods."

115.    Pine Rest knew it required, requested, suffered, or permitted the Hourly Employees to work during their unpaid "meal periods."

116.    Pine Rest knew the Hourly Employees regularly spent their unpaid "meal periods" substantially performing their regular job duties for Pine Rest's predominant benefit.

117.    Pine Rest knew, should have known, or recklessly disregarded the fact that the Hourly Employees performed compensable work during their unpaid meal breaks.

118.    Pine Rest knew it automatically rounded the Hourly Employees clock in and clock out punches to the nearest quarter hour for its primary benefit.

119.    Pine Rest knew it paid Ellison and the other Hourly Employees non-discretionary bonuses.

120.    Pine Rest knew it was required to include these non-discretionary bonuses in their regular rates of pay.

121.    Pine Rest knew these non-discretionary bonuses were not included in Ellison's and the other Hourly Employees' regular rates of pay for overtime purposes.

122.    And Pine Rest knew the FLSA requires it to pay Ellison and the other Hourly Employees at least 1.5 times their regular rates of pay—based on all remuneration—for all hours worked in excess of 40 a workweek.

123.    Pine Rest's failure to pay Ellison and the other Hourly Employees overtime at the required rates—based on all remuneration—for all overtime hours worked was neither reasonable, nor was this decision made in good faith.

124.    Pine Rest knowingly, willfully, and/or in reckless disregard carried out these unlawful policies that deprived Ellison and the Hourly Employees of earned wages, including overtime wages at the required rate of pay—based on all remuneration—for all hours worked after 40 a workweek, in violation of the FLSA.

## CAUSE OF ACTION

### FAILURE TO PAY OVERTIME UNDER THE FLSA
### (FLSA COLLECTIVE)

125.    Ellison brings her FLSA claims as a collective action on behalf of herself and the other Hourly Employees pursuant to 29 U.S.C. § 216(b).

126.    Pine Rest violated, and is violating, the FLSA by employing non-exempt employees such as Ellison and the other Hourly Employees in a covered enterprise for workweeks longer than 40 hours without paying them overtime wages at rates not less than 1.5 times their regular rates of pay—based on all remuneration—for the hours they worked in excess of 40 a workweek.

127.    Pine Rest's unlawful conduct harmed Ellison and the other Hourly Employees by depriving them of the overtime wages they are owed.

128.    Accordingly, Pine Rest owes Ellison and the other Hourly Employees the difference between the wages actually paid and the required overtime wages actually earned.

129.    Because Pine Rest knew or showed reckless disregard for whether this auto-deduction policy, rounding policy, and bonus pay scheme violated the FLSA, Pine Rest owes Ellison and the other Hourly Employees these wages for at least the past 3 years.

130.    Pine Rest is also liable to Ellison and the other Hourly Employees for an amount equal to all their unpaid overtime wages as liquidated damages.

131.    Finally, Ellison and the other Hourly Employees are entitled to recover all reasonable attorneys' fees and costs incurred in this action.

### JURY DEMAND

132.    Ellison demands a trial by jury on all Counts.

### RELIEF SOUGHT

WHEREFORE, Ellison, individually and on behalf of the other Hourly Employees, seeks the following relief:

a.   An Order designating this lawsuit a collective action and authorizing notice to the Hourly Employees allowing them to join this action by filing a written notice of consent;

b.   An Order finding Pine Rest liable to the Hourly Employees for unpaid overtime wages owed under the FLSA, plus liquidated damages in an amount equal to their unpaid wages;

c.   A Judgment against Pine Rest awarding the Hourly Employees all their unpaid overtime wages, liquidated damages, and any other penalties available under the FLSA;

d.   An Order awarding attorneys' fees, costs, and expenses;

e.   An Order awarding pre- and post-judgement interest at the highest applicable rates; and

f.   Such other and further relief as may be necessary and appropriate.

Dated: June 30, 2026

Respectfully submitted,

**JOSEPHSON DUNLAP LLP**

By: */s/Michael A. Josephson*
Michael A. Josephson
TX Bar No. 24014780
Andrew W. Dunlap
TX Bar No. 24078444
5847 San Felipe St, Suite 2400
Houston, Texas 77057
Phone: (713) 352-1100
Fax:     (713) 352-3300
mjosephson@mybackwages.com
adunlap@mybackwages.com

Richard J. (Rex) Burch*
TX Bar No. 24001807
**BRUCKNER BURCH, PLLC**
5847 San Felipe St, Suite 2400
Houston, Texas 77057
Phone: (713) 877-8788
Fax:     (713) 877-8065
rburch@brucknerburch.com

William C. (Clif) Alexander
Austin W. Anderson
**ANDERSON ALEXANDER PLLC**
101 N. Shoreline Blvd., Suite 610
Corpus Christi, Texas 78401
Telephone: (361) 452-1279
clif@a2xlaw.com
austin@a2xlaw.com

*Pro hac vice forthcoming*

**ATTORNEYS FOR ELLISON &
THE HOURLY EMPLOYEES**